IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELA LEE DUNKLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 10-1360 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff, Angela Lee Dunkle, seeks judicial review of a

decision of Defendant, Commissioner of Social Security ("the

Commissioner"), denying her applications for disability

insurance benefits ("DIB") and supplemental security income

("SSI") under Titles II and XVI, respectively, of the Social

Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently

before the Court are the parties' cross-motions for summary

judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth

below, Plaintiff's motion for summary judgment will be granted,

and the Commissioner's cross-motion for summary judgment will be

denied.

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system.  With respect to Plaintiff's claim for DIB, her earnings record shows
that she has acquired sufficient quarters of coverage to remain insured
through December 31, 2012.  (R. 17).

1

## II. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on June 5, 2008, alleging disability since April 1, 2008 due to high cholesterol and mental illness. (R. 125-31, 132-37, 159). Plaintiff's applications were denied and she requested a hearing before an administrative law judge ("ALJ"). (R. 88). Plaintiff, who was represented by counsel, testified at the hearing which was held on August 13, 2009. A vocational expert ("VE") also testified. (R. 30-64).

The ALJ issued a decision on October 5, 2009, denying Plaintiff's applications for DIB and SSI based on his determination that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2] (R. 14-29). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on August 17, 2010. (R. 1-6). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

## III. BACKGROUND

Plaintiff testified at the hearing before the ALJ as follows:

---

[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a).

Plaintiff was born on July 11, 1972,[3] and she is a high school graduate. At the time of the hearing, Plaintiff, who is 5'4" tall, weighed 297 pounds. (R. 35-37). With regard to work history, Plaintiff has held jobs as a salad bar worker at an Eat 'n Park restaurant (9/1/2000 - ?), a desk clerk at a Super 8 motel (9/1/2003 - 12/1/2005), a cashier at a Sheetz convenience store (1/1/2007 - 9/1/2007) and a cashier at a McDonald's restaurant (12/1/2007 - 6/1/2008).[4] (R. 57-58, 160).

Plaintiff receives treatment at the Irene Stacey Community Mental Health Center for anxiety and depression. She sees a therapist once a month and a psychiatrist for medication checks every 2 to 3 months. When anxious, Plaintiff picks at her arms and legs causing open sores. At the time of the hearing, Plaintiff was being treated for a Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection in the sores on her legs.[5] Despite the mental health treatment, Plaintiff continued to cry a lot, avoid social situations and experience panic attacks. (R. 38-40). Plaintiff also suffers from high

---

[3] At the time of the hearing before the ALJ, Plaintiff was 37 years old. (R. 35).

[4] The Court notes that although Plaintiff worked at a McDonald's restaurant until June 1, 2008, she alleges on onset date of disability of April 1, 2008.

[5] MRSA is a Staphylococcus or "staph" infection that is resistant to several common antibiotics. www.nlm.nih.gov/medlineplus (last visited 5/18/2011) ("Medlineplus"). Due to the MRSA infection in her leg sores, Plaintiff's primary care physician recommended that she quit her last job at a McDonald's restaurant. (R. 45, 50). Plaintiff testified at the hearing that she picked her arms and legs every day while she was working at McDonald's. After Plaintiff quit working, she picked her arms and legs once or twice a week. (R. 52).

cholesterol, insomnia and fatigue. (R. 41, 48, 54). In addition, Plaintiff testified that she has "some" trouble with her right ankle, *i.e.* ""[i]t cracks on me every once in a while." (R. 54). At the time of the hearing, Plaintiff was taking the following prescribed medications: Trazadone (insomnia), Naltrexone (anxiety), Abilify (depression) and Klonopin (anxiety). (R. 199).

As to activities of daily living, Plaintiff can perform routine household chores and care for her own personal needs, but she does not go out by herself due to anxiety and panic attacks from being around other people. As a result, Plaintiff does not go grocery shopping unless she is accompanied by her mother. (R. 42- 43). Plaintiff spends a couple of hours each day in a recliner because her legs "bother" her when she stands too long. Plaintiff does not know the cause of her leg pain. (R. 55).

## IV. MEDICAL EVIDENCE[6]

On May 12, 2007, Plaintiff went to the Emergency Room of Armstrong County Memorial Hospital complaining of swelling, blisters, redness and pain in her right lower extremity. Plaintiff's physical examination revealed "an extensive area of large bulla (blisters) just below the level of the knee with

---

[6] In summarizing the medical evidence, the Court has included medical records pre-dating Plaintiff's alleged onset date of disability (April 1, 2008) for background purposes.

4

thickened red skin extending from the mid thigh on its medial and anterior surface all the way to the lower leg nearly to the level of the ankle." In addition, Plaintiff had "some healed abrasions and what appeared to be small abscesses that had healed as well." (R. 206). Plaintiff's primary diagnosis was cellulitis, and a culture of a wound on her right leg was positive for MRSA infection.[7] Plaintiff was treated with intravenous antibiotics and discharged six days later. (R. 202-12).

On May 29, 2007, Plaintiff was seen by Dr. Richard A. Mercurio, her primary care physician, for a wound check.[8] Dr. Mercurio noted that Plaintiff's leg had improved with the medications. During this visit, Plaintiff reported, among other things, insomnia, depression and anxiety, and Dr. Mercurio prescribed Prozac (depression) and Klonopin (anxiety) for Plaintiff. (R. 249-51).

During a follow-up visit with Dr. Mercurio for a wound check and generalized anxiety disorder ("GAD") on June 19, 2007, Plaintiff continued to report insomnia, depression and anxiety.

---

[7] Skin infections are the most common type of staph infections. They can look like pimples or boils. They may be red, swollen and painful, and sometimes have pus or other drainage. They can turn into impetigo, which turns into a crust on the skin, or cellulitis, a swollen, red area of skin that feels hot. Some staph infections are resistant to certain antibiotics, making the infections harder to treat. Medlineplus.

[8] The date on which Dr. Mercurio became Plaintiff's primary care physician is not clear. The doctor's May 29, 2007 office note is the earliest treatment record in Plaintiff's case file. In any event, it is clear that Dr. Mercurio is a long-time treating source.

Dr. Mercurio increased the dosage of Klonopin prescribed for Plaintiff. (R. 246-48).

Despite the medications prescribed by Dr. Mercurio, during a follow-up visit with Tasha Dodd, his physician's assistant ("PA"), on July 16, 2007, Plaintiff presented with large open lesions on her right leg. The dosage of Prozac prescribed for Plaintiff was increased and Bactroban ointment was prescribed to treat Plaintiff's leg wounds. (R. 244-45).

During a follow-up visit with PA Dodd on July 23, 2007, it was noted that the ulceration on Plaintiff's right leg was smaller since her last visit; however, Plaintiff had four small lesions on her left lower leg. With regard to Dr. Mercurio's referral of Plaintiff for a psychiatric evaluation, Plaintiff reported that she could not get an appointment until September. (R. 242-43).

On August 13, 2007, during a follow-up visit with PA Todd, Plaintiff presented with new lesions on her right lower leg. Dr. Mercurio was consulted, and he recommended a surgical consultation with Dr. Christine Edwards for "MRSA/cellulitis." (R. 240-41).

During a follow-up visit on September 12, 2007, Dr. Mercurio noted that Dr. Edwards prescribed DuoDerm patches for the lesions on Plaintiff's right leg which had improved. Dr.

Mercurio also noted that Plaintiff's GAD had improved with the Prozac and Klonopin. (R. 237-39).

On October 11, 2007, Plaintiff was evaluated by Dr. Grace McGorrian, a psychiatrist, at the Irene Stacy Community Mental Health Center in connection with the repeated picking of her arms and legs. Plaintiff reported "problems with impulsive behaviors for probably two decades," including regular continual overeating and "problems with checking such things as her car lock." With respect to Plaintiff's mental status examination, Dr. McGorrian noted that Plaintiff was quiet and cooperative; that she displayed no increase in psychomotor activity or psychotic thinking; that her intellect appeared to be low average; that her answers to questions were appropriate and goal directed; that she seemed unconcerned about the severity of her problem; that her judgment appeared adequate because she understood the need for treatment; and that her insight was quite limited.[9] Dr. McGorrian's diagnoses included (1) Impulse Control Disorder, NOS, (2) Binge Eating Disorder (Provisional), (3) Obsessive Compulsive Disorder, Checking Subtype, Mild, and

---

[9] Dr. McGorrian examined Plaintiff's legs and arms and noted the following: "She had multiple healing and reopened wounds and bruises on her shins with many, many scars from repeated self-injuries. She had some smaller similar areas on her forearms. The open areas of her wounds are perhaps a cm each surrounded by two to three inches of circular prior injury and healing. In addition, on the inner right calf there is a large confluent healed hyper-pigmented area consistent with prior cellulitis." (R. 269-70).

7

(4) Morbid Obesity.[10]  Dr. McGorrian rated Plaintiff's score on the Global Assessment of Functioning ("GAF") scale a 65,[11] and she recommended changes in Plaintiff's medications due to the severity of her behavior and the ineffectiveness of her prescribed medications.  (R. 268-71).

During a medication check with Dr. McGorrian on November 19, 2007, Plaintiff reported that she had had a terrible month due to verbal abuse by her boss at the convenience store job. Plaintiff also reported that the new medications had "made absolutely no difference," ... "if anything she is worse." Plaintiff was tearful and the lesions on her legs were no better.  Dr. McGorrian recommended that Plaintiff pursue a new job and made several adjustments to her medications.  (R. 275).

Plaintiff was seen by Dr. Mercurio for a follow-up visit on December 12, 2007.  Plaintiff reported increased insomnia, anxiety and depression, and she had blisters on her right thigh. (R. 233-36).

---

[10] With respect to the obesity diagnosis, Plaintiff informed Dr. McGorrian that she was 5'2" or 5'3" tall and weighed 260 pounds following a 30-pound weight loss.  (R. 269).

[11] The GAF scale is used by clinicians to report an individual's overall level of functioning.  The scale does not evaluate impairments caused by physical or environmental factors.  The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness.  The highest possible score is 100, and the lowest is 1.  A GAF score between 61 and 70 denotes the following: "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (2000), at 34 (bold face in original) ("*DSM-IV-TR*").

By the time of her medication check with Dr. McGorrian on February 7, 2008, Plaintiff had changed jobs and she was assisting in the care of her niece due to her sister's incarceration. Plaintiff reported significant improvement on her adjusted medication regimen; however, she had allowed her prescriptions to run out, apparently due to a lack of insurance. Dr. McGorrian reported that Plaintiff was more obese, very tearful and quite depressed. An examination of Plaintiff's legs revealed no open wounds, but a significant number of healing bruises and discolored areas. Plaintiff was given samples of medication and referred to patient assistance for medications. (R. 274).

During a follow-up visit with Dr. Mercurio on March 13, 2008, Plaintiff presented with cellulitis and an abscess on her right leg. The doctor noted that Plaintiff seemed to begin picking her leg again after the Klonopin was discontinued, and he described this condition as "acute progressing." Plaintiff also reported "[a] lot of fatigue" due to insomnia, as well as back pain. Dr. Mercurio prescribed Klonopin and Bactroban ointment for Plaintiff. (R. 229-32).

During a medication check with Dr. McGorrian on May 1, 2008, Plaintiff reported that she was working at McDonald's and that her supervisor was very nice and made accommodations for her when she was feeling stressed. Plaintiff also reported

increased mutilation of her leg due to the stress of the job transition and increased difficulty sleeping. Dr. McGorrian's examination of Plaintiff's right leg showed "a number of prior bruised and scarred areas that [looked] gouged and scabbed." Dr. McGorrian adjusted Plaintiff's medications "in the hopes we can control her self-mutilation." (R. 273).

Plaintiff was seen by Dr. Mercurio for a follow-up visit on May 12, 2008. She reported continued picking of the right leg, which had scabs and sores. Plaintiff's diagnoses were cellulitis, insomnia and fatigue. (R. 224-27).

During a medication check on June 2, 2008, Dr. McGorrian noted that Plaintiff was being seen on an "urgent" basis at her mother's request because Plaintiff's gouging of her legs had increased since she started working at McDonald's and Dr. Mercurio recommended that she stop working. Plaintiff reported that she wanted to work and had always worked, but that the stresses at work and the feelings she gets around other people increase the chance that she will harm herself. Despite taking all of her prescribed medications, Dr. McGorrian noted that Plaintiff was tearful and her lip was quivering during the appointment. Plaintiff's lower legs were marked, bruised and gouged with some areas of fresh bleeding. In addition, Plaintiff's abdomen had multiple areas that she had gouged. Dr. McGorrian noted that Plaintiff's illness was "more active" and

10

had not responded to current treatments. Dr. McGorrian
prescribed new medication for Plaintiff and considered LTSR
(Long Term Structured Residence) if Plaintiff's self-harm
continued at a high pace. (R. 272).

Plaintiff saw Dr. Mercurio for a follow-up visit on August
11, 2008. Her physical examination revealed sores on both legs
and her abdomen. Dr. Mercurio described Plaintiff's history as
follows: "Disabled, permanently, due to depression, self
inflicting wounds, high cholesterol, wt. problems, can't walk or
stand for very long, knee pain, trouble getting up and down. L.
knee is worse. Has severe GAD." Plaintiff was instructed to
continue her then current medications and she was prescribed
Bactroban ointment for her leg sores. (R. 331-34).

On August 12, 2008, Edward Zuckerman, Ph.D., a non-
examining State agency psychological consultant, completed a
Psychiatric Review Technique form in connection with Plaintiff's
applications for DIB and SSI based on Listing 12.06 (anxiety-
related disorders) and Listing 12.08 (personality disorders) in
the Social Security Regulations. Dr. Zuckerman opined that
Plaintiff suffers from OCD and impulse control disorder, but
that neither disorder met the criteria of Listings 12.06 and
12.08. With regard to functional limitations, Dr. Zuckerman
indicated that Plaintiff had no restrictions in her activities
of daily living; that she had mild difficulties in social

functioning; that she had moderate difficulties in concentration, persistence and pace; and that there was insufficient evidence of repeated episodes of decompensation, each of an extended duration. (R. 276-88).

During a medication check with Dr. McGorrian on September 15, 2008, Plaintiff reported that her stress level had dropped since she stopped working. Once again, Plaintiff had allowed her medications to lapse. As a result, it could not be determined whether she had benefited from any of the medications. On exam, Plaintiff continued to be "very obese but much better groomed" and she was less dysphoric. Dr. McGorrian renewed Plaintiff's medications as samples and urged her to return before they ran out. (R. 316).

Plaintiff's next medication check took place on November 6, 2008. Dr. McGorrian noted that Plaintiff was "doing well," and that Plaintiff was "at home with her mother and sister taking care of the sister's brand new baby...." Plaintiff reported "some picking and scratching at her legs," but not as severely as when she was working. On exam, Plaintiff was nicely dressed; appeared to have lost some weight; was moving a little more fluidly; and looked cheerful. Dr. McGorrian indicated that she was happy with Plaintiff's progress and renewed her medications without change. (R. 315)

During a follow-up visit on November 25, 2008, Dr. Mercurio noted that Plaintiff's chronic GAD was stable on her current medications. However, plaintiff continued to report difficulty sleeping, and she had open sores on her right thigh and left lower leg. Plaintiff also reported back pain. Plaintiff's medications were continued. (R. 327-30).

In a Physical Capacity Evaluation dated November 25, 2008, Dr. Mercurio listed Plaintiff's medical diagnoses as morbid obesity, GAD, fatigue, chronic leg and back pain and anxiety. Dr. Mercurio indicated that as a result of her diagnoses, Plaintiff had decreased mobility and endurance and that she had difficulty focusing and staying on task. In an 8-hour workday, Dr. Mercurio opined that Plaintiff could sit for a total of 6 hours, stand for a total of 2 hours and would have to lie down for a total of 2 hours. The doctor also opined that Plaintiff could lift between 11 and 20 pounds. (R. 289-92).

Plaintiff reported during her next medication check with Dr. McGorrian on January 29, 2009, that she was enjoying being at home and taking care of her new niece. Because her sister was incarcerated, Plaintiff reported that she and her mother were providing most of the baby's care. Plaintiff acknowledged continued picking when criticized. Otherwise, her self-picking was not "too bad." On exam, Plaintiff was described as cheerful. No changes were made in her medications. (R. 314).

Plaintiff presented for her follow-up visit with Dr. Mercurio on March 25, 2009 with open sores on her right thigh and abdomen. Plaintiff's medications were continued. (R. 323-26).

Plaintiff's mother accompanied her to her next medication check with Dr. McGorrian on April 27, 2009. The mother reported that Dr. Mercurio was "very concerned" about Plaintiff because she has limited healthy skin for grafting if she continued to pick at herself. On exam, Plaintiff continued to be "very obese." There was one open lesion on her calf and a number of picked lesions on her abdomen. The mother reported that Plaintiff had additional picked lesions on her hips and that she had a MRSA infection. Dr. McGorrian adjusted Plaintiff's medications. 9R. 313).

Plaintiff brought her niece to the next medication check with Dr. McGorrian on June 1, 2009, and she was accompanied by a case manager. Plaintiff reported a definite decrease in self-mutilation since the change in her medications. She appeared more relaxed and less likely to break into tears, and she was "quite confident" with her niece. Dr. McGorrian noted an additional stressor in Plaintiff's life, *i.e.*, her uncle was recently released from prison and moved into their house. No medications changes were made. (R. 312).

During a follow-up visit with Dr. Mercurio on June 30,
2009, Plaintiff reported that her GAD, self-picking and insomnia
had improved. Plaintiff also reported that her right foot
"cracks" when she walks long distances. Dr. Mercurio continued
Plaintiff's medications and ordered an x-ray of Plaintiff's
right ankle. (R. 319-22). The x-ray, which was performed on
July 9, 2009, did not reveal evidence of an acute fracture or
dislocation. (R. 318).

On July 31, 2009, Dr. Robert L. Eisler, a psychiatrist,
performed a consultative evaluation of Plaintiff. During the
evaluation, Plaintiff reported that she had worked since she was
16 years old; that she stopped working due to MRSA infection;
that she would like to return to work but her doctor said she
was not ready; that she felt "down and blue" 90% of the time;
that she has severe insomnia; and that she often cries. Dr.
Eisler noted that Plaintiff was "quite subdued, but personable
and cooperative;" that she was of average intelligence; that her
mood was "quite depressed;" that she was obese, weighing about
300 pounds; and that she had MRSA-infected lesions on her left
forearm and her legs. Dr. Eisler's diagnoses were Major
Depressive Disorder and MRSA infection. He indicated
Plaintiff's MRSA infection had "worsened her depression;"
described her prognosis as "guarded;" rated her GAF score as

30;[12] and stated: "Probably in regard to the MRSA, she will be unable to return to work for one year or more." (R. 294-95).

With respect to occupational adjustments, Dr. Eisler opined that Plaintiff's ability to follow work rules and ability to interact with supervisors were poor. As to performance adjustments, Dr. Eisler opined that Plaintiff's ability to understand, remember and carry out simple, detailed and complex job instructions was poor.[13] Finally, regarding personal-social adjustments, Dr. Eisler opined that Plaintiff's abilities to maintain personal appearance, behave in an emotionally stable manner and demonstrate reliability were good, and that her ability to relate predictably in social situations was fair. (R. 296-97).

On August 6, 2009, shortly before the ALJ hearing, Dr. McGorrian and Deborah Lovewell, Plaintiff's therapist at the Irene Stacy Community Mental Health Center, completed questionnaires regarding Plaintiff's condition. Dr. McGorrian and Ms. Lovewell opined that Plaintiff was not able to sustain full-time employment. (R. 299-300). As to functional

---

[12] A GAF score between 21 and 30 denotes the following: **"Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends). *DSM-IV-TR*, at 34.

[13] Dr. Eisler noted that he rated Plaintiff's ability to make performance adjustments as poor for the following reason: "Marked as such because of the decision by her attending to prevent a return to employment – MRSA Infection?" (R. 296).

16

limitations, Dr. McGorrian and Ms. Lovewell opined that Plaintiff was moderately limited in activities of daily living; markedly limited in social functioning; seldom experienced deficiencies in concentration, persistence and pace; and had experienced three or more episodes of deterioration or decompensation, each of an extended duration. (R. 305). With regard to activities, Dr. McGorrian and Ms. Lovewell noted that Plaintiff helps with cleaning at home; she will only go shopping when accompanied by her mother; she cooks occasionally; she is able to take public transportation independently; she lives with her mother and "probably" could not maintain her own residence; she is able to get along with others but did not appear "particularly outgoing;" her ability to initiate social contacts is limited; she communicates fairly clearly; she has difficulty being in group situations due to anxiety; she lacks social maturity; she becomes tearful and anxious when criticized; she can get along with co-workers; she does not have friends; she can carry out simple instructions; she reported the ability to perform activities within a schedule, attend to a task from beginning to end, sustain a routine, make decisions, perform at a consistent pace and maintain regular attendance; she may have difficulty adapting to changes and reacting to deadlines; and

conflict increases Plaintiff's anxiety and depression as well as picking at her skin.[14]  (R. 306-10).

## V. ALJ'S DECISION

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process.  See 20 C.F.R.

---

[14] Plaintiff's counsel submitted additional medical evidence to the Appeals Council in connection with Plaintiff's request for review of the ALJ's decision, which, as noted previously, was denied.  The evidence included another Physical Capacity Evaluation completed by Dr. Mercurio on December 22, 2009, office records of Dr. Mercurio for the period September 9, 2009 to January 15, 2010, and additional questionnaires completed by Dr. McGorrian and Ms. Lovewell on January 4, 2010.  (R. 344-61, 373-85).  Because the ALJ's decision was rendered without consideration of this evidence, the Court may not consider it in determining whether the decision was supported by substantial evidence.  Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir.1991), citing United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963) (Evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence).

§§ 404.1520(a)(4), 416.920(a)(4).  The process was described by

the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as

follows:

\*  \*  \*

Pursuant to his statutory authority to implement the
SSI Program, (footnote omitted) the Secretary has
promulgated regulations creating a five-step test to
determine whether an *adult* claimant is disabled.  Bowen v.
Yuckert, 482 U.S. 137, 140-42 (1987).  (footnote omitted).
The first two steps involve threshold determinations that
the claimant is not presently working and has an impairment
which is of the required duration and which significantly
limits his ability to work.  See 20 C.F.R. §§ 416.920(a)
through (c)(1989).  In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989).  If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry.  § 416.920(d).  If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps.  At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience.  If the
claimant cannot do his past work or other work, he
qualifies for benefits.

\*  \*  \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one

through four of the sequential evaluation process for making

disability determinations.  At step five, the burden shifts to

the Commissioner to consider "vocational factors" (the

claimant's age, education and past work experience) and

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy in light of his or her RFC. <u>Ramirez v. Barnhart</u>, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability, and the medical evidence established that Plaintiff suffers from the following severe impairments: major depressive disorder, obsessive compulsive disorder ("OCD"), impulse control disorder and binge eating disorder. (R. 19-20).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 8.04 relating to skin disorders and Listings 12.04, 12.06 and 12.08, relating to affective disorders, anxiety related disorders and personality disorders, respectively. (R. 20-21).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: (1) only simple and repetitive work; (2) no high stress work such as work involving

high quotas or close attention to quality production standards;
(3) no work that involves teamwork or team type activities; (4)
no work involving interaction with the public; (5) no work
requiring immersion of her arms or legs in fluids of any kind;
(6) no work in a sterile environment; and (7) no work involving
food preparation. (R. 22-26). The ALJ then proceeded to step
four, finding that in light of Plaintiff's RFC, she is unable to
perform any of her past relevant work. (R. 26-27).

Finally, at step five, considering Plaintiff's age,
education, work experience and RFC and the VE's testimony, the
ALJ found that Plaintiff could perform other work existing in
the national economy, including the jobs of surveillance system
monitor, bench assembler, cleaner and document preparer. (R.
27-28).

## VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is
limited to determining whether the decision is supported by
substantial evidence, which has been described as "such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion." Richardson v. Perales, 402 U.S. 389, 401
(1971). It consists of something more than a mere scintilla,
but something less than a preponderance. Dobrowolsky v.
Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court
would have decided the case differently, it must accord

deference to the Commissioner and affirm the findings and decision if supported by substantial evidence.  Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## VII. DISCUSSION

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[15]  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999), *quoting* Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987).  Moreover, if a treating source's opinion on the issues of the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case, it is entitled to controlling weight.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Plaintiff's initial argument in support of her motion for summary judgment relates to the weight accorded the opinion evidence in the ALJ's decision.  Specifically, Plaintiff asserts

---

[15]In this connection, the Social Security Regulations provide that, generally, an ALJ is to give more weight to the opinions of a claimant's treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

that the ALJ erred in disregarding the opinions of her long-time

treating sources, Dr. Mercurio and Dr. McGorrian, and the

opinion of the consultative psychiatric examiner, Dr. Eisler,

each of whom rendered the opinion that Plaintiff could not

perform substantial gainful activity due to her physical and

mental impairments.  (Docket No. 11, pp. 8-13).  After

consideration, the Court agrees.[16]

### Opinion of Dr. Mercurio

With respect to the Physical Capacity Evaluation completed

by Dr. Mercurio on November 25, 2008 (R. 290-92), the ALJ noted

Dr. Mercurio's status as a treating source; Dr. Mercurio's

diagnoses of morbid obesity, GAD, fatigue, chronic leg and back

pain and anxiety; and Dr. Mercurio's opinion that Plaintiff is

significantly limited by her physical limitations, *i.e.*, a low

endurance for walking, standing, pushing and pulling and a need

to lie down for 2 hours during the day.  The ALJ gave "little

weight" to Dr. Mercurio's opinion, however, because "[Plaintiff]

testified to various activities of daily living" which "is not

---

[16] Because Plaintiff's argument regarding the weight accorded to the opinions of her long-time primary care physician and psychiatrist is dispositive of the cross-motions for summary judgment, it is not necessary to address the ALJ's rejection of Dr. Eisler's opinion that Plaintiff is unable to return to work for a year or more because it was based on Plaintiff's MRSA infection rather than her major depressive disorder, or Plaintiff's alternative arguments in support of summary judgment which include the insufficiency of the ALJ's RFC assessment, the inadequacy of the hypothetical question posed to the VE by the ALJ, the ALJ's failure to find that she meets a listed impairment and the ALJ's failure to consider the severity of her physical impairments.

consistent with [Plaintiff] having significant physical limitations." (R. 25).

As noted by Plaintiff with regard to the weight accorded Dr. Mercurio's opinion by the ALJ, a review of the hearing transcript shows that, in fact, very little testimony was elicited concerning her daily activities. (Docket No. 11, p. 10). Specifically, in response to questions by the ALJ, Plaintiff testified that she is able to perform routine household chores and care for her personal needs. (R. 42-43). However, the ALJ fails to address Plaintiff's further testimony that she is only able to do housework a few hours before she gets fatigued, and that she has to "spend a couple of hours in a recliner a day" due to leg pain.[17]  (R. 55).  Simply put, Plaintiff's testimony during the hearing regarding her activities of daily living is not substantial evidence supporting the ALJ's rejection of Dr. Mercurio's opinion.

In Frankenfield v. Bowen, 861 F.2d 405 (3d Cir.1988), a Social Security disability claimant appealed from a summary judgment entered in favor of the Secretary of Health and Human Services. The claimant contended that the case should be remanded to the agency for further proceedings because, among

---

[17] The Court notes that Plaintiff's testimony in this regard in supported by the office notes of Dr. Mercurio and the report of Dr. Eisler's consultative examination which indicate that Plaintiff complained of insomnia or fatigue on May 29, 2007, June 19, 2007, December 12, 2007, March 13, 2008, May 1, 2008, May 12, 2008, November 25, 2008 and July 31, 2009 and back, leg or knee pain on March 13, 2008, August 11, 2008, November 25, 2008.

24

other things, the ALJ did not give proper weight to the reports
of his treating physician.  In reversing the judgment of the
district court and remanding the case for further proceedings,
the Third Circuit stated in relevant part:

*    *    *

    Here three treating physicians, crediting
Frankenfield's subjective complaints, which are consistent
with the tests they conducted, determined that he is
disabled.  The Secretary cannot reject those medical
determinations simply by having the administrative law
judge make a different medical judgment.  Rather, the
medical judgment of a treating physician can be rejected
only on the basis of contradictory medical evidence.  E.g.,
Rossi v. Califano, 602 F.2d 55, 57 (3d Cir.1979).  The
administrative law judge refers to no such evidence.  It is
undisputed that Frankenfield cannot return to his former
job.  The administrative law judge points to no evidence
tending to support his conclusion that Frankenfield could
perform alternative substantial gainful employment existing
in the national economy.  The administrative law judge
referred to clinical tests that are claimed to support that
conclusion, but he did not address the symptoms that the
treating physicians credited, or suggest why his evaluation
of the clinical tests was superior to theirs....  What we
are left with is a rejection of a medically credited
symptomatology based solely on the administrative law
judge's observation of the claimant at the hearing, and
claimant's testimony that he took care of his personal
needs, performed limited household chores, and occasionally
went to church.  That is not permissible.  Benton for
Benton v. Bowen, 820 F.2d 85, 88 (3d Cir.1987); Kent v.
Schweiker, 710 F.2d 110, 114 (3d Cir.1983).

*    *    *

    Similarly, in the present case, there is absolutely no
medical evidence contradicting Dr. Mercurio's assessment of the
limitations resulting from Plaintiff's physical impairments.
Neither a consultative medical examiner nor a State agency

physician completed a physical RFC assessment for Plaintiff. As a result, the ALJ rejected Dr. Mercurio's opinion regarding Plaintiff's physical limitation based on his evaluation of the medical evidence. In so doing, he erred.[18]

### Opinion of Dr. McGorrian

In the Questionnaire completed on August 6, 2009, Dr. McGorrian (and Plaintiff's therapist) rendered the opinion that Plaintiff is unable to sustain full-time employment due to her mental impairments. When asked to explain this opinion, Dr. McGorrian responded as follows:

> "Angie becomes anxious and worked up when under stress. Her hygiene is poor and it doesn't appear that she would be appropriate in a work setting. When she is stressed she picks at her skin and has lesions all over her body."

(R. 300).

The ALJ rejected Dr. McGorrian's opinion because her answers in the questionnaire were "internally inconsistent." Specifically, the ALJ noted that "Dr. McGorrian stated the claimant has marked restriction in social functioning, but also stated the claimant is able to get along with others and

---

[18] See also Morales v. Apfel, 225 F.3d 310 (3d Cir.2000)(In considering claim for disability benefits, ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion); Jones v. Sullivan, 954 F.2d 125 (3d Cir.1991)("In Frankenfield, we established that, in the absence of contradictory medical evidence, an ALJ in a social security disability case must accept the medical judgment of a treating physician."); Ferguson v. Schweiker, 765 F.2d 31 (3d Cir.1985)("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").

communicate fairly well."[19] (R. 26). After consideration, the Court agrees with Plaintiff that the ALJ's rejection of Dr. McGorrian's opinion that she is markedly limited in social functioning based on alleged internal inconsistencies in the questionnaire was erroneous. (Docket No. 11, pp. 11-12).

In the section of the questionnaire addressing the area of social functioning, Dr. McGorrian noted that Plaintiff "seems" to be able to get along with others; that she does not appear "particularly outgoing;" that her ability to initiate social contacts is limited; that she communicates fairly clearly; that she has difficulty in group situations due to anxiety; that she lacks social maturity; that she becomes tearful and anxious when she perceives criticism; that she stated she can get along with coworkers; that she does not have friends with whom to socialize; and that she withdraws from interaction with the public. (R. 307-08). Based on the totality of Dr. McGorrian's findings relating to Plaintiff's social functioning, which the ALJ fails to address, the Court agrees with Plaintiff that her ability to get along with others and to communicate fairly clearly does not preclude an opinion that she is markedly limited in social functioning. These abilities may be limited

---

[19] In addition, the ALJ determined that "the level of restriction found by Dr. McGorrian is not consistent with the claimant's activities of daily living." (R. 26). For the reasons noted in the Court's discussion of the ALJ's rejection of Dr. Mercurio's opinion, the testimony regarding Plaintiff's activities of daily living was insufficient to discredit Dr. McGorrian's opinion.

to one-on-one encounters, family gatherings or small groups.
They do not necessarily apply to a work setting. Thus, the
alleged internal inconsistency was not a permissible basis for
the ALJ's rejection of Dr. McGorrian's opinion.

The ALJ also erred in giving more weight to the opinion of
Dr. Zuckerman, the non-examining State agency psychological
consultant, than the opinion of Dr. McGorrian. (R. 26). With
respect to evaluating opinion evidence, the Social Security
Regulations provide that "... because non-examining sources have
no examining or treating relationship with you, the weight we
will give their opinions will depend on the degree to which they
provide supporting explanations for the opinions. We will
evaluate the degree to which these opinions consider all of the
pertinent evidence in your claim, including opinions of treating
and other examining sources." 20 C.F.R. §§ 401.1527(d)(3),
416.927(d)(3).

Dr. Zuckerman completed the Psychiatric Review Technique
form in which he opined that Plaintiff was not disabled by her
mental impairments on August 12, 2008, approximately two months
after Plaintiff's applications for DIB and SSI were filed.
Thus, Dr. Zuckerman's opinion was rendered without consideration
of the notes of Plaintiff's medication checks with Dr. McGorrian
between September 15, 2008 and June 1, 2009, or the opinion of
Dr. McGorrian on August 6, 2009 regarding Plaintiff's inability

28

to engage in substantial gainful activity due to her mental impairments. Further, a review of the Psychiatric Review Technique form completed by Dr. Zuckerman fails to reveal adequate supporting explanations for his opinion that Plaintiff is not disabled by her mental impairments. <u>Brownawell v. Comm. of Social Security</u>, 554 F.3d 352, 357 (3d Cir.2008), *citing* <u>Dorf v. Bowen</u>, 794 F.2d 896, 901 (3d Cir.1986)("... this Court has 'consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician.'"); <u>Cadillac v. Barnhart</u>, 84 Fed.Appx. 163 (3d Cir.2003)(ALJ, in social security disability benefits case, impermissibly substituted her own medical opinion for that of a physician when, in determining the claimant's RFC, she gave controlling weight to the opinions of two non-examining state agency physicians while rejecting the conflicting opinion of another non-examining physician; the state agency physicians had not had access to the claimant's complete medical record, whereas the other physician did have such access).

Based on the foregoing, judgment will be entered in favor of Plaintiff and against the Commissioner.

William L. Standish
United States District Judge

Date: May 19, 2011